# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| TIKEILA RUCKER, RACHAEL SPRIGGS, DAMON CURRY-MORRIS, AMBER SHERMAN, and LAJUANA ABRAHAM,<br><br>    Plaintiffs,<br><br>v.<br><br>SHELBY COUNTY BOARD OF EDUCATION and CAROLYN JACKSON, in her official capacity as Chief of Safety and Security for the SHELBY COUNTY BOARD OF EDUCATION,<br><br>    Defendants. | No. 2:23-cv-02358-SHL-cgc |

**ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Before the Court is Plaintiffs' Motion for Preliminary Injunction, (ECF No. 8), filed June 14, 2023. Defendants responded on July 5, 2023, (ECF No. 24), and a hearing, during which three witnesses testified, occurred on July 13, 2023, (ECF No. 30). Plaintiffs seek to enjoin Defendants from banning them from attending Shelby County Board of Education ("Board") meetings and stepping on Board property, both now and in the future, arguing that the ban violates their First Amendment rights. However, based on the record before the Court at this preliminary stage, there is not a <u>strong</u> showing of either Plaintiffs' likelihood of success on the merits or irreparable harm. Therefore, the Motion is **DENIED**.

## BACKGROUND

Much of the background information that follows is based on the testimony at the hearing on Plaintiffs' Motion for Preliminary Injunction.

Plaintiffs are political activists in Memphis and Shelby County, particularly in the area of education. They have a long history of attending Board meetings to voice their concerns about the Board's activities. Plaintiff Tikeila Rucker testified that she has attended Board meetings for over ten years, and Plaintiff Damon Curry-Morris testified at the hearing that he has attended Board meetings for over twenty. Neither has ever been banned from attending Board meetings or disciplined in any other way for actions taken at Board meetings prior to the events leading to this litigation.

The Board has written rules governing Board meetings, including rules governing public participation. (ECF No. 8-3.) To speak at a Board meeting, members of the public must submit "Public Comment Cards/Forms" to the Board Chair prior to the meeting. (Id. at PageID 83.) Each public speaker is allotted up to three minutes to speak. (Id.) As stated in the rules, "[s]peakers will not be permitted to engage in gossip, make defamatory comments, or use abusive or vulgar language. The Chair shall have the authority to terminate the remarks of any individual who is disruptive or does not adhere to Board rules." (Id.) The Board's written rules do not specify what conduct qualifies as "disruptive," other than "gossip," "defamatory comments," and "abusive or vulgar language." (Id.) Nor do they specify what punishments may be imposed on members of the public who violate the rules, other than "terminat[ion of their] remarks." (Id.)

Based on the testimony offered, Defendant Carolyn Jackson, the Chief of Safety and Security for the Board, has the sole discretion to decide what happens when someone violates the rules in a way that she concludes creates safety concerns. She does not need input from the Board before taking action against Board meeting participants when she determines that there is a safety issue. She may even take action based on conduct not specifically prohibited in the

written rules if she concludes that there are safety concerns.  If she finds a safety concern, one option available to her is to issue an "Authorization of Agency" ("AoA"), which is an order barring members of the public from Board property by threat of criminal prosecution for trespassing.  Jackson has worked in her current role as Chief of Safety and Security for approximately eighteen months and only issued one AoA prior to the incidents at issue here.

      The Board held a public meeting on May 9, 2023.  Plaintiffs' and Defendants' versions of what happened at this meeting differ.  According to Jackson, during Plaintiff Rachael Spriggs's allotted time to speak, she made a comment that the Board Chair deemed in violation of the rules.  She was warned to stop, but did not.  The Board Chair then told her that her time to speak was over and that she must sit down.  Jackson testified that other attendees in the audience, including some or all of the other Plaintiffs,[1] then joined Spriggs at the podium.  Rather than sit down, however, Spriggs and the others at the podium became loud, argumentative, and confrontational, so security attempted to ask them to sit down, according to Jackson, but Curry-Morris blocked security from the podium.  Jackson stated that security touched Curry-Morris, but did not "grab" him, and that he made unspecified threats to her and other officers.  Curry-Morris did leave the podium after Jackson told him that she would talk with him after the meeting.  Rather than return to his seat, both sides agree that he left the meeting and called the police to report that security had assaulted him.  The other Plaintiffs also left the podium after about five to ten minutes of disruption, according to Jackson.  They were allowed to return to their seats and were not told to leave the meeting.

---

[1] Rucker and Curry-Morris testified to being at the podium during Spriggs' time to speak. Jackson testified that Plaintiff Lajuana Abraham also went to the podium and that she thinks Plaintiff Amber Sherman did, too.

3

Plaintiffs disagree with some portions of Jackson's version of events. Rucker and Curry-Morris testified that they and others were already at the podium with Spriggs when she was told that her time to speak was over. Plaintiffs also deny being disruptive, though they seemingly do not dispute that there was some sort of argument over why Spriggs was told that she must stop speaking. Curry-Morris denies that he blocked security from the podium and threatened them. He also alleges that they "grabbed" him, and he demanded to know why.

Following this incident, Jackson believes that Rucker, Abraham, Sherman, and Spriggs coordinated to further disrupt the meeting. They sat near each other in the audience, and, according to Jackson, Rucker watched for security to step out of view and then gestured to the others. As a video recording of the incident entered into evidence shows, after she gestured, the others rose from their seats and walked through the audience toward the exit. The video also shows that, as they walked, Abraham dropped a "panic alarm" device on the floor, immediately creating a loud noise, and Sherman dropped another "panic alarm" on the floor several seconds later.[2] Defendants assert that the deployment of the devices was intentional, a conclusion that Plaintiffs do not appear to dispute. Security picked up the devices off the floor, tried to muffle the sound as best they could, and took the devices outside the building. Jackson testified that security had to destroy the devices and remove their batteries to silence them. One of the videos in evidence includes the audio, with a loud alarm heard over the Board member who was talking when they were deployed.

---

[2] As Jackson testified, these "panic alarm" devices are activated by pulling a pin out of the device. Once the pin is pulled, the device sounds an alarm, which grows steadily louder until the pin is put back in the device. According to Jackson, Abraham and Sherman took the pins with them when they left the meeting.

4

Following the May 9 meeting, Jackson banned Plaintiffs from attending Board meetings and from being on any Shelby County school property. (ECF No. 24-2.) Jackson testified that she concluded that Plaintiffs posed safety risks based on the Board members panicking when the panic alarms were deployed, staff members' statements to her that they no longer felt safe sitting with their backs to the audience, and alleged threats made to her officers, among other things. According to Jackson, Plaintiffs' bans did not prevent them from other forms of communication with the Board, and Rucker and Curry-Morris both testified that they communicated directly with Board members while the ban was in place.

Based on the testimony at the hearing, some Plaintiffs learned of their bans on May 12, 2023, when they tried to attend another Board meeting. Spriggs and Abraham attempted to enter that meeting but were not allowed to do so. Rucker stated that she learned of Spriggs's and Abraham's bans as it was happening, so she tried to attend the meeting herself. She was not allowed to attend either and, while discussing the situation with those who were stopping her from entering the meeting, she was told by a Memphis Police Department officer that she was banned "forever" from Board property. Jackson was also present when Rucker was turned away, and she offered to talk to Rucker later about her ban so that they could resolve the matter. Rucker never contacted Jackson to have that discussion.

Jackson sent each Plaintiff a letter[3] dated May 30, 2023,[4] which purports to explain the reasons for the bans. (ECF No. 24-2.) The section of the letters addressed to Rucker, Spriggs, Curry-Morris, and Sherman titled "Actions Warranting Issuance of AoA" mention the disruption

---

[3] It appears that the letters sent to Plaintiffs were not the actual AoAs, but rather explanations of them. If this interpretation is correct, the actual AoAs were not introduced as evidence at the hearing and do not appear to be part of the record at this time.

[4] Rucker testified that she did not receive the May 30 letter, but did receive an almost identical one dated May 31.

at the podium during Spriggs' allotted time to speak at the May 9 Board meeting, with Spriggs's letter also including her initial violation of Board rules that precipitated the incident at the podium. Rucker's, Spriggs's, Abraham's, and Sherman's letters also state that the deployment of the panic alarm devices "formed the District's basis for having an AoA issued and restricting your access to District property—the safety risk posed by the deployment of a panic device during an active and heavily attended meeting." (ECF No. 24-2.) Finally, Curry-Morris's letter states that he blocked security personnel from accessing the podium and filed a false police report alleging that security assaulted him. The letters also state that Jackson hopes to resolve the matter and offers to hold in-person discussions to "listen and build understanding."[5]

Abraham, Sherman, Spriggs, and Curry-Morris attempted to attend a Board meeting on May 30, 2023. According to Curry-Morris, he received the May 30 letter via text message approximately fifteen minutes before the meeting started. When these Plaintiffs tried to enter the meeting, they were turned away at the metal detectors in the building in which the meeting was being held.[6] This entry by Plaintiffs onto Board property violated their AoAs, prompting Jackson to extend the length of the bans imposed, according to her.

Jackson sent each Plaintiff another letter dated May 31, 2023, updating them as to the reasons and lengths of their bans. (ECF No. 24-3.) These letters are substantially similar to the May 30 letters, with an additional paragraph at the end explaining how long each Plaintiff was banned from Board property. According to these letters, Rucker was banned for thirty days from

---

[5] Interestingly, each of the May 30th letters refers to a meeting that had been scheduled for May 31st but that was allegedly cancelled by two of the people who received AoAs. The evidence presented at the hearing offered no clarity on this issue.

[6] In his testimony at the July 13 hearing, Curry-Morris stated that he was at a rally outside the building on May 30 but denied trying to enter. However, he admits in the Motion that he and all other Plaintiffs except Rucker attempted to attend that meeting. The seemingly contradictory positions could be the result of an honest confusion over dates.

May 9, 2023, until June 11, 2023.  (Id. at PageID 145.)  Spriggs and Curry-Morris were banned for sixty days from May 9, until July 11, 2023: thirty days for the "initial offense" and another thirty days for their violation of the AoAs on May 30.  (Id. at PageID 147, 149.)  Abraham and Sherman were banned for ninety days from May 9, until August 10, 2023: sixty days for the "initial offense" and another thirty days for their violation of the AoAs on May 30.  (Id. at PageID 151, 153.)

Each letter included Jackson's email address in the last paragraph and invited Plaintiffs to schedule a meeting with her to discuss their bans.  No Plaintiff took Jackson up on her offer to meet, although Curry-Morris testified that he called the Board "every day" after he was banned from Board meetings to discuss his AoA.  However, Jackson testified that she never received any call from him.

The Board held another meeting on June 9.  Plaintiffs state in their Motion that they attempted to enter this meeting but were turned away at the front of the building.  However, Jackson testified that Plaintiffs did not enter Board property that day and thus did not violate the AoAs.

Rucker and Curry-Morris have not attempted to attend any meetings since their bans expired.  Indeed, both testified that they did not know when their bans expired despite both also testifying that they received the May 31 letter.

## LEGAL STANDARD

In determining whether to grant a preliminary injunction, a court must balance four factors: (1) the likelihood of success on the merits, (2) whether a plaintiff is likely to suffer irreparable harm without an injunction, (3) whether the balance of equities tips in the plaintiff's favor, and (4) whether the injunction is in the public interest.  Obama for Am. v. Husted, 697

F.3d 423, 428 (6th Cir. 2012). "When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." Id. at 436 (internal quotation omitted). "This is because the public's interest and any potential harm to the parties or others largely depend on the constitutionality of the state action." ACLU Fund of Mich. v. Livingston Cnty., 796 F.3d 636, 642 (6th Cir. 2015) (internal quotation omitted). It is not enough for a movant to show that he will more likely than not prevail on the merits—he must show a "strong" likelihood of success. Leary v. Daeschner, 228 F.3d 729, 739 (6th Cir. 2000).

"In deciding a motion for preliminary injunction, the Court is not limited to the four corners of the complaint but rather may rely on evidence, including affidavits and hearsay materials, which would not be admissible evidence for a permanent injunction if the evidence is appropriate given the character and objectives of the preliminary injunctive proceeding." Doe #11 v. Lee, 609 F. Supp. 3d 578, 592 (M.D. Tenn. 2022) (citing Express Franchise Servs., L.P. v. Impact Outsourcing Sols., Inc., 244 F. Supp. 3d 1368, 1379 (N.D. Ga. 2017); Action NC v. Strach, 216 F. Supp. 3d 597, 629 (M.D.N.C. 2016)).

## ANALYSIS

Plaintiffs seek an injunction preventing the enforcement of the AoAs, contending that they did not engage in any disruptive action, much less an action that caused a safety concern. In addition to contesting that Jackson had reason to take any action against them, Plaintiffs also contend that any forward-looking ban from Board meetings violates their constitutional rights under the First Amendment. Although they appear to concede that a disruptive participant in a school board meeting could be removed from that meeting, prospectively banning that participant from future board meetings, no matter how short the ban or how egregious the

conduct, is categorically violative of the First Amendment, according to Plaintiffs. Defendants argue that Plaintiffs' conduct at the May 9 Board meeting justified a temporary ban because it was disruptive and posed safety concerns to others present, and contend that the bans imposed here were appropriate.

As an initial matter, although the parties do not distinguish between the Plaintiffs who are no longer banned from Board meetings and those whose ban remains in place, the Court must do so. Based on the evidence before the Court, Rucker, Spriggs, and Curry-Morris are no longer banned from Board meetings or from Board property. Therefore, to the extent they request that the Court enjoin Defendants from enforcing the AoAs issued against them, the Motion is moot. To the extent they argue that injunctive relief is necessary because Defendants may issue another AoA against them, there is no evidence that that is likely. Jackson issued only one AoA in her tenure as Chief of Safety and Security before issuing these AoAs. Rucker and Curry-Morris both testified that they have attended Board meetings for many years and have had no adverse action taken against them until the events at issue here. Given Plaintiffs' long histories of attending Board meetings without issue until they engaged in the May 9 conduct, these three have failed to establish that they are likely to suffer irreparable harm (exclusion from a Board meeting) absent an injunction. The Motion for Preliminary Injunction is therefore **DENIED** as to these three Plaintiffs.

As for Abraham and Sherman, at this stage, these Plaintiffs also fail to establish that they are entitled to injunctive relief. Although proof of irreparable harm remains a question for these two Plaintiffs as well, given the lack of proof as to any meetings scheduled to occur while their bans remain in place, the parties' arguments focus exclusively on the likelihood of success on the merits. Thus, the Court will also focus on this factor.

9

Plaintiffs argue that banning them from Board meetings violates their First Amendment rights, and that an injunction must issue to protect those rights. While the First Amendment generally protects the right to speak freely, that right "is not absolute, especially when a would-be speaker seeks access to government property as a platform for his speech." Lowery v. Jefferson Cnty. Bd. of Educ., 586 F.3d 427, 432 (6th Cir. 2009). The extent to which the government may regulate speech depends on the context of the speech and the government's reasons for restricting it. Id. School board meetings are limited public forums, in which citizens are offered a chance to express their views, but which "cannot accommodate the sort of uninhibited, unstructured speech that characterizes" traditional public fora like public parks and streets. Id.

In a limited public forum, the government may regulate the time, place, and manner of speech so long as the regulation: (1) is content-neutral, (2) is narrowly tailored to serve a significant government interest, and (3) leaves open ample alternative channels for communication of the information.[7] Id. Plaintiffs' argument focuses primarily on the second prong, arguing that their alleged disruption "does not justify the Ban." (ECF No. 8-1 at PageID 64).[8] Defendants argue that the bans were justified, particularly given the safety concerns at

---

[7] Plaintiffs do not appear to dispute that they have had alternative channels for communication while the bans have been in place, and Defendants offered evidence supporting those alternative channels. As Jackson testified, Plaintiffs were not banned from communicating their concerns about Board activities to the Board in any way that did not require them to physically enter Board property. Moreover, Rucker admitted being in contact with Board members about her ban, and Curry-Morris testified that Board members had reached out to him about his ban.

[8] In their Motion, Plaintiffs include one statement as to whether the ban is based on content: "this Ban, is in part, driven by the Plaintiffs' robust public statements criticizing the SCBoE for its failed superintendent search." (ECF No. 8 at PageID 66.) They expanded on that argument slightly at the hearing, but, as explained below, the Court finds no evidence at this stage that Plaintiffs' bans were content-based.

issue. As explained below, the Court finds that, at this stage, Plaintiffs have not shown a strong likelihood of success on the question of whether or not the bans were narrowly tailored to serve a significant government interest. While the proof does not include all the answers necessary on this issue, based on what is before the Court, the preliminary injunction must be denied.

As an initial matter, it appears that both sides agree that, in some situations, people may be removed from school board meetings based on safety concerns or disruptive rule violations. Here, however, there remain both factual and legal issues—did Plaintiffs disrupt the May 9 meeting and create safety concerns, if so, and can those actions result in a ban on future attendance at meetings?

First, there is proof in the record that Plaintiffs caused a disruption at the May 9 meeting. The video of Abraham and Sherman dropping the panic alarms led to immediate reactions by security, who swiftly picked them up and took them outside. Even with that swift action, members of the audience immediately began looking for the source of the alarm, and one person can even be seen attempting to plug her ears with her fingers as if the noise caused her pain. Board members initially stopped talking, but then one tried to speak over the alarms, but stopped again. The video does not show when the noise ended, and it is unclear how long the noise lasted.

Plaintiffs presented no evidence disputing that the alarms disrupted the meeting, instead relying on an assertion that they did not actually disrupt the meeting because the alarms sounded for "less than a minute." (ECF No. 8-1 at PageID 60.) The video does not show how long the alarms sounded, but, even taking Plaintiffs' assertion at face value, a disruption of "less than a minute" is nonetheless a disruption. Although there are factual disputes as to what occurred at the podium, the alleged confrontational gathering there before the activation of the panic alarms,

11

to the extent that Defendants rely on that as well, adds to the proof (or at least creates a disputed fact that needs more proof) that Plaintiffs disrupted the May 9 Board meeting.

Plaintiffs also presented no evidence rebutting Jackson's testimony that their conduct presented safety concerns. Jackson testified that she received reports that staff no longer felt safe sitting with their backs to the audience because of the alarms, causing her to suggest a different seating arrangement. Without proof to the contrary at this stage, the Court can only conclude that there were disruptions and safety concerns.

The remaining issue for purposes of this Motion is whether the actions Jackson took in response, the prospective ban, should be enjoined from remaining in place—whether the ban is narrowly tailored to serve a significant government interest. Based on the evidence before the Court, Plaintiffs have failed to show a strong likelihood of success on this issue. Plaintiffs seemingly do not dispute that maintaining decorum and safety are significant government interests but appear to argue that prospective bans from attending future Board meetings are categorically not narrowly tailored to serve those interests. Defendants point out that courts have upheld even indefinite bans, particularly for plaintiffs who present safety concerns. They then contend that Plaintiffs' temporary bans are narrowly tailored to ensure the safety and decorum of Board meetings because they are designed to ensure that Plaintiffs understand that it is unacceptable to disrupt Board meetings and create safety concerns. As explained below, the Court agrees with Defendants, based on the current record.

First, Defendants may restrict speech in a limited public forum when doing so is necessary to advance a significant government interest. Lowery, 586 F.3d at 427. In Lowery, the court approved a prospective restriction on speech at school board meetings to prevent disruption, though not a prospective preclusion from attendance. There, the plaintiffs' children

12

were dismissed from a school football team for "challenging [the coach's] leadership." Lowery, 586 F.3d at 430. The parents complained unsuccessfully to various officials and then sought written permission to speak at an upcoming school board meeting. Id. The director of schools denied their request pursuant to a policy prohibiting "frivolous, repetitive, [and] harassing" speech, believing their anticipated speech to be "harassing" because it threatened legal action and contained derogatory comments about personnel, as well as "repetitive" because the parents had already had a private meeting with the director of schools to air these grievances. Id. The plaintiffs sued, arguing that their preemptive ban from speaking violated the First Amendment, even though they were allowed to still attend the meeting. Id.

On appeal following a jury verdict for the defendants, the Sixth Circuit held that the defendants' policy prohibiting "frivolous, repetitive, [and] harassing" speech serves the significant government interest of ensuring that school board meetings are structured, rather than chaotic, which in turn allows other citizens to make their voices heard. Id. at 433. In addition, the court found that the policy narrowly advances that interest because the policy allows almost all speech except when it is likely to interfere with efficient and productive meetings. Id. The court explained that, to pass muster, a restriction on speech in a limited public forum "'need not be the least restrictive or least intrusive means' of serving the government's objective," but need only not be "substantially broader than necessary to achieve the government's interest," even if "the government's interest could be adequately served by some less-speech-restrictive alternative." Id. (quoting Ward v. Rock Against Racism, 491 U.S. 781, 798, 800 (1989)).

Second, future, or prospective bans are not categorically prohibited. While the Sixth Circuit has not addressed this issue, other Courts of Appeals have approved such bans. See, e.g., Lovern v. Edwards, 190 F.3d 648, 650-52 (4th Cir. 1999) (holding that an indefinite ban from all

13

school board property was constitutional due to the plaintiff's "pattern of verbal abuse and threatening behavior towards school officials"); Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist., 877 F.3d 136, 140-45 (3d Cir. 2017) (affirming the district court's grant of qualified immunity to school officials who barred the plaintiff from school board property indefinitely because his conduct was "intolerable, threatening and obnoxious" and he was "interfering with the function of the School Board").

Here, because this ban is tied to both disruptions and safety concerns, a temporary prospective exclusion may be justified, particularly given that Plaintiffs' bans are relatively short compared to the indefinite bans that other courts have upheld for plaintiffs who presented safety concerns. While Plaintiffs argue the alleged arbitrariness of the length of their bans because, as Plaintiffs assert, they are no less dangerous thirty, sixty, or ninety days after May 9 than they were that day, Jackson testified that the purpose of the bans was not to exclude Plaintiffs from Board meetings until they are no longer dangerous, but to emphasize to them that their conduct on May 9 was unacceptable. Moreover, the means chosen to drive the Board's point home "need not be the least restrictive or least intrusive means of serving the government's objective." Lowery, 586 F.3d at 433 (internal quotation omitted).

Plaintiffs resist this conclusion, relying primarily on two cases: Ritchie v. Coldwater Community Schools, 947 F. Supp. 2d 791 (W.D. Mich. 2013), and Walsh v. Enge, 154 F. Supp. 3d 1113 (D. Or. 2015). However, these cases are inapposite.

In Ritchie, the plaintiff sought to air his grievances at a school board meeting after his daughter told him that her teacher assaulted her. Ritchie, 947 F. Supp. 2d at 801. Board officials cut him off as he spoke, citing the rules of the meeting. Id. at 803. After the meeting, the plaintiff went to the school board's Administrative Service Center to obtain documents and

called the police to complain that the school superintendent refused to give him the documents he sought. Id. at 803-04. When asked "whether [the superintendent] wanted Ritchie on the school property," the superintendent said that he did not. Id. The police officer then sent an email to other officers telling them that the plaintiff was to be arrested for trespassing if he entered school board property. Id. The plaintiff was later arrested for picketing, but not entering, one school board meeting and then for attending two more. Id. at 805-06. The plaintiff sued, alleging, *inter alia*, that his ban from school board meetings violated the First Amendment.

Defendants moved for summary judgment, arguing that the plaintiff's ban was a valid time, place, and manner restriction, as he allegedly disrupted school board meetings and caused safety concerns. However, the court stated that "there is significant evidence in the record that Ritchie was never disruptive or disrespectful at the School Board meetings he attended and did [ ] not engage in threatening behavior." Id. at 813. Rather, the court concluded that the "evidence tend[ed] to show that [the school official's] concern was not safety, but the content of Ritchie's speech during the public comment period." Id. at 815-16. Because it concluded that there was a genuine dispute as to whether the plaintiff's ban was viewpoint-based, the court denied the defendants' motion for summary judgment as to the First Amendment claims.

Here, however, the evidence presented thus far does not indicate that Defendants banned Plaintiffs from Board meetings because of the viewpoints they expressed. When pressed on this issue at the hearing, the only evidence Plaintiffs pointed to is that not everyone who joined Spriggs at the podium on May 9 received an AoA. But this evidence cuts the other way—everyone at the podium was critical of the Board, but not all of them received an AoA. Thus, at this stage, it appears that the factor that led Jackson to ban Plaintiffs is not their criticism of the

15

Board, or, at the very least, there is a factual dispute on this issue such that the answer does not lean strongly in Plaintiffs' favor. Ritchie is therefore inapplicable.

In Walsh, the city mayor barred the plaintiff from city hall meetings for sixty days after a meeting at which he "raised his voice and interrupted proceedings." Walsh, 154 F. Supp. 3d at 1118. The plaintiff challenged the sixty-day ban as violative of his First Amendment rights.

The defendants moved for summary judgment, arguing that the sixty-day ban was a valid time, place, and manner restriction because public safety concerns and the avoidance of disruption are significant government interests justifying a temporary ban. The court examined whether the ban was justified, i.e., whether it was narrowly tailored to serve a significant government interest, holding that it was not. Finding no evidence of safety concerns in the record, the court concluded that the disruptive incidents did not justify the prospective exclusion of an individual from future public meetings. Id. at 1132.

Thus, the issue in Walsh was disruption, not safety, with the court specifically concluding that there was no evidence of safety concerns in the record. Here, there is evidence of safety concerns from the panic alarms. Jackson testified that Board members expressed to her that they no longer felt safe sitting with their backs to the audience because of the alarms that Abraham and Sherman dropped. Although Plaintiffs argue that Defendants' safety concerns are pretextual, they present no evidence contradicting Jackson's testimony. This lack of evidence rebutting Jackson's testimony reinforces the Court's central point—the lack of evidence at this stage of the case and the resulting need to develop the record supports denial of the preliminary injunction because, based on this record, Plaintiffs have not made a strong showing of a likelihood of success on the merits.

## **CONCLUSION**

Whether a plaintiff's ban from school board property is constitutional is a highly fact-intensive inquiry that requires a court to examine the plaintiff's conduct, the board's response, and whether the board's response is justified in light of the severity of the plaintiff's conduct, i.e., whether it is narrowly tailored to serve the significant government interests of preserving order at board meetings and ensuring the safety of those present. Based on the facts adduced thus far, it is unclear whether Plaintiffs will ultimately prevail on their claims. There remain questions of fact surrounding many aspects of this case, including what happened at the podium during Spriggs's allotted time to speak at the May 9 Board meeting, when and how the decision to temporarily ban Plaintiffs from Board meetings was made and communicated to Plaintiffs, what the Board's policy is on what conduct is acceptable at Board meetings, and what guidelines Jackson follows in deciding what punishments to impose on those who violate the rules of Board meetings or create safety risks.

But, at this stage, Plaintiffs have the burden of showing that there is a <u>strong</u> likelihood that they will ultimately prevail on their claims. They have not done so. The evidence presented by Plaintiffs thus far does not rebut Defendants' position that Plaintiffs presented safety concerns following their conduct on May 9 and that their bans were justified by these concerns. The Motion is **DENIED**.

**IT IS SO ORDERED**, this 4th day of August, 2023.

s/ Sheryl H. Lipman  
SHERYL H. LIPMAN  
CHIEF UNITED STATES DISTRICT JUDGE